Howrx, Judge,
delivered the opinion of the court:
The question presented arises under the French spoliation act of January 20, 1885, 23 Stat. L., 283, on the claimant’s motion for the court to find and allow the amount and value of a cargo. This by way of addition to an allowance in the nature of an award to the same claimant for the value of his interest in the vessel which carried the cargo. The amount and value of this cargo was excluded in the original action of the court for the reason that it was not shown by any competent evidence that the vessel carried evidence of the neutral ownership of the cargo. 39 C. Cls., 119.
The decree of condemnation was not rested upon the want of the neutral character of the contents of the vessel. But it is conceded by the claimant that the United States can raise defenses not included in the decree of the prize tribunal.
The condemnation proceedings were had subsequent to July, 1798. This was after the abrogation' of the treaty between this country and France. The decision of this cause must therefore be governed by the rules of international law.
At the time of the condemnation a statute of the United States required and prescribed a form of a register of every vessel. Sec. 4155, B.. S. By section 4197 the requirement appears to be for the master to deliver to the collector a sworn manifest of his cargo, upon which the collector grants a clearance to both vessel and contents of the ship, but without specifying the particulars unless required to do so. The form of this manifest is set forth in section 4199 and the form of the clearance in section 4201.
Not until long after the period of French spoliations (by the act of Feb. 10, 1820, 3 Stats., 542), the provisions of *294 which are incorporated in section 4200, K. S., was any manifest of the cargo required from owners, shippers, or consignors. Section 4306 provides that a passport must be furnished at the request of the master when the vessel is going to a foreign country, the form of which is prescribed, by the Secretary of State. From the foregoing recitals it appears that none of the papers is intended to show the ownership or neutrality of the cargo!
Article XXY of the treaty, existing before the condemnation of this vessel, stated what the passport and the certificate of the cargo must contain. Neither ownership nor neutrality of the cargo was required to be shown. The articles permit the ownership of the cargo to be stated, if desired. As no invoice or bill of lading was required by the laws of the United States save in the case of imported cargoes, it is apparent that the reason for the requirement set forth is that duty may be collected upon the imported goods.
In the Venus, 27 C. Cls. R., 116, the court held that the absence of the passport and manifest did not render an American merchantman liable to condemnation, but left her without the benefits of the treaty and subject to the rules and requirements of international law. It was further said in that case that the purpose of a treaty of amity and commerce (referring to the treaty which had been abrogated at the time of this capture) must have been to mitigate and not to augment the severities of international law. It would seem then that we are warranted in assuming that the rules of international law were more strict with reference to a cargo than when protected by a liberal treaty. “ The severities of international law” can only mean that if a master fails to carry proof of his cargo he can not complain if his cargo be treated as enemy property.
The papers usually expected to be found on a vessel, and their nature, are enumerated with great exactness in Hal-leck’s International Law, Chapter XX, section 19; 1 Kent’s Commentaries, page 157; Wheaton on Captures, 65.
It was inferentially assumed by counsel for claimants that all papers other than those required by the statute were on *295 board this captured vessel. But the only one of the papers having reference to the cargo was the manifest (It., 10) brought from the Treasury. It appears then not only upon the authority of the statute, of international law, and of the Betsey, 36 C. Cls. R., 256, but likewise upon an inspection of the paper itself, that there was nothing to show ownership and neutrality of the cargo at the time of the capture and the condemnation proceeding.
The remaining papers in the record are the protest and invoice. The protest (It., 12) is fatally silent as to ownership and neutrality save the adventure of the master, which does not appear to be claimed.
The invoice alone remains. The one in the record could not have been on board because the record paper comes from the possession of an insurance broker on land. No necessity arose to place that paper in the insurance broker’s possession until payment of insurance was demanded of him. If the master had a duplicate of that invoice on board it was his duty to say so when he entered his protest.
The facility with which necessary ship’s papers may be fabricated (and according to international law writers such papers are sometimes manufactured) presents a reason why papers on board are not always conclusive. But in this case the court is without affirmative evidence that there was either an original or duplicate invoice on board at all. The presumption is great that there was no such paper on board the schooner.
Like reliance upon “ the custom of Wiscasset ” the absence of the necessary paper in this case is an equally fatal omission of commercial foresight. A vessel can not sail with no documentation of cargo, according to the rules of international law, and expect redress, except in the mode and methods provided for by the rules of international law.
This motion, then, must be decided according to the rules of international law. “No civilized nation * * * will venture to disregard the uniform sense of the established writers on international law.” 1 Kent Com., 18; The Paquete Habana, 175 U. S., 701. But independent of adjudicated cases the act of our jurisdiction requires that where there is no treaty resort must be had to writers on the laws *296 of nations as between each other for trustworthy evidence of what international law really is. Hilton v. Guyot, 159 U. S., 113.
It is true that some exceptions have been made as to the presence of papers. It has sometimes been held that mere lack of a paper does not warrant condemnation. But from the outset this court has adhered very generally to its first ruling in making exceptions, although some of the writers on international law have advocated the enforcement of the rigid rule without exception. The rule of this court is that the absence of some of the papers may be explained or proof made of what they would have disclosed if produced.
In prize cases the evidence to acquit or condemn must come, in the first instance, from the papers and crew of the captured ship. The Supreme Court long ago said that it is exclusively upon these papers and examinations that the cause is to be heard. If the matter be doubtful or the case suspicious, further proof can be granted according to the rules which govern the legal discretion of the prize court. The Dos Hermanos, 2 Wheat., 76.
There is ample support for the rule acted upon by this court from the decision of the Amiable Nancy, 3 Wheat., 546 where Mr. Justice Story, speaking for the court, said that the mere want of papers might be a circumstance of suspicion, but could be explained by the preparatory examinations of the officers and crew and by the fact of a voluntary arrival of a ship at a belligerent port.
Although according to the authorities a prize court can and should allow a captured vessel to account for a missing document, the prize court is entitled to the best evidence of which the nature of the case is susceptible. The vessel being at a distance from her home port, it follows that the best evidence at hand will be the testimony of her master and crew. Nothing more can be done by a privateer making a capture. The belligerent taking possession of a neutral. under such circumstances takes action on the evidence so presented by either releasing the vessel or carrying her in for further examination (on the evidence so taken) by the prize tribunal.
*297 The subsequent protest is an ex parte instrument made by the most responsible person on a vessel as soon after a grievance as it can be made, and is for the information of. the owners and underwriters. Such a protest can not be in existence until after seizure and generally in practice until after condemnation. If a protest were in existence at the time of condemnation, and could be before a prize court, it would not be the most satisfactory evidence before the prize tribunal because of its ex parte character and the want of opportunity on the part of the belligerent making the seizure to cross-examine the officer making the protest.
In dealing with spoliation claims, however, the act of our jurisdiction provides that the court “ shall receive all suitable testimony on oath or affirmation, and all other proper evidence, historic and documentary, concerning the same; and decide upon the validity of the claims according to the rules of law, municipal and international, and the treaties of the United States applicable to the same.” Under this command of the statute the court has uniformly admitted as evidence the subsequent protests (made nearly contemporaneous with the transaction) for whatever they may be worth as a part of the res gestae in connection with the other proof and circumstances in the case leading up to a decree of condemnation.
Generally speaking, protests can have but little value as against the recitals of a decree of a prize court where the decree shows a valid ground of condemnation. 'Where protests are delayed beyond a reasonable time, it would seem that they should be disregarded like all other subsequent affidavits in such cases. The burden of the proof is with the claimant to establish illegality. Legally competent evidence is necessary to do it. Ship Parkman, 35 C. Cls. R., 406; Brig Juno, 36 C. Cls. R., 239; Sloop Margaret, 37 C. Cls. R., 13; Brig Sally, 37 C. Cls. R., 74; Brig Maria, 39 C. Cls. R., 39; The Endeavor, 44 C. Cls. R., 242.
As there is a failure to show the presence of any paper to establish the neutral character of the cargo and likewise a failure to offer evidence in the absence of such paper, the failure to make proof of neutrality is fatal to claimants’ position in this cause.'
*298 The contention, that France through the United States should be held to prove the absence of such papers or that proof to supply their contents was not made would have the effect of shifting the burden upon the defendants of proving a negative. This would be against the universal principle of international law that the burden of establishing innocence, regularity, and neutrality of the voyage and cargo is upon the claimants to be adduced from evidence from the vessel alone or from its officers and crew.
Motion overruled.